REED v REED

Docket No. 248895. Submitted January 18, 2005, at Detroit. Decided
    February 8, 2005, at 9:05 a.m.

    Verladia Reed sought a divorce from Gregory J. Reed in the Wayne
    Circuit Court in October 2000. The parties had executed a
    prenuptial agreement in 1975 that provided, among other things,
    that each party would have complete control of the party's
    separate property acquired in an individual capacity and that the
    defendant was to be awarded the marital residence in a divorce.
    The plaintiff moved for partial summary disposition, asserting
    that the prenuptial agreement was unenforceable. Following a
    hearing, the court, Kathleen MacDonald, J., granted partial
    summary disposition to the plaintiff, determining the prenuptial
    agreement to be null and void. The court noted that only one
    provision of the prenuptial agreement expressly contemplated
    divorce, that the parties entered into the prenuptial agreement at
    a time when agreements contemplating divorce were not yet valid
    in Michigan, and that the parties' circumstances had so changed
    since the prenuptial agreement was executed as to make its
    enforcement unfair and unreasonable. Following trial, the court
    entered an opinion and order determining the property in the
    marital estate and rejecting the defendant's claim that much of
    that property should have been excluded because it was his
    separate property or owned by business entities related to the
    defendant. The court ordered an equal division of the marital
    estate, and appointed a receiver to sell certain property located in
    Oakland County and distribute the proceeds. The court also
    ordered the defendant to pay a portion of the plaintiff's attorney
    fees because she had been forced to incur expenses as a result of
    the defendant's unreasonable conduct in the litigation. The
    defendant appealed the pretrial order granting partial summary
    disposition and the divorce judgment that implemented the
    court's opinion and order.

    The Court of Appeals *held*:

    1. The prenuptial agreement is clear, unambiguous, and valid,
    and the trial court erred by finding that changed circumstances
    justified not enforcing it. There is no clear authority supporting

the conclusion that a prenuptial agreement is invalid merely because it was entered into before *Rinvelt v Rinvelt*, 190 Mich App 372 (1991), recognized prenuptial agreements that contemplated divorce. The fact that the parties had a long marriage and the fact that their assets grew significantly over that time, with one party's assets growing more significantly than the other party's, were not unforeseeable changed circumstances that justified voiding the prenuptial agreement. Although only one paragraph of the prenuptial agreement specifically mentions divorce, the agreement read as a whole clearly contemplates more than the parties' marital home.

2. The defendant rather than the plaintiff was entitled to partial summary disposition under MCR 2.116(I)(2). The plaintiff had the burden of proof and persuasion to establish that the prenuptial agreement was void and that there was no genuine issue of material fact in that regard. The plaintiff acknowledged signing a prenuptial agreement, but offered no evidence calling into question the document the defendant produced. The plaintiff may not vary the terms of a clear and unambiguous written contract with parol evidence. Any failure of the defendant to disclose his assets when the parties entered into the agreement was immaterial, given the clear record showing that the parties started their marriage with virtually no assets. Absent some unfairness, there was no requirement that the plaintiff be represented by counsel before she committed to the binding prenuptial agreement.

3. Because the trial court erred by not enforcing the prenuptial agreement, it also erred in determining the marital estate and each party's separate property, which is the first step necessary to divide the parties' property equitably. As a result, it is also premature to address the equitable division of property.

4. The trial court did not clearly err by including certain property in the marital estate, including the proceeds of a condemnation proceeding. The parties acquired the property later condemned as tenants by the entirety and the plaintiff's quitclaim deed to a third party could not convey the title vested by that tenancy. Nor did the trial court err by concluding that the other entities the defendant claimed had an interest in the condemnation proceeds were either owned or controlled by the defendant and were thus one and the same with him.

5. The trial court clearly erred by including the Oakland County property and the defendant's Malcolm X papers in the marital estate because the defendant acquired that property in his individual capacity or through an entity he controlled. Invasion of

a spouse's separate property is not permitted without factual findings that the other spouse demonstrated an additional need, MCL 552.23(1), or contributed to the acquisition, improvement, or accumulation of the property, MCL 552.401.

6. The trial court abused its discretion by appointing a receiver to sell the Oakland County property because that property was not part of the marital estate and the trial court did not find that it was appropriate to award the plaintiff a portion of this separate property under a statutory exception. Because the receiver has taken steps to sell portions of the property, it will be necessary for the trial court on remand to fashion appropriate orders to terminate the receivership as may be equitable. The trial court may make further findings of fact and enter such orders as are supported by those findings, including continuing the receivership if equitable to do so.

7. The trial court abused its discretion by awarding attorney fees to the plaintiff without finding that the defendant's conduct was unreasonable and that a causal connection existed between that conduct and fees actually incurred, and without finding that the fees incurred were reasonable. Beyond a general statement that the defendant prolonged the litigation, which statement does not permit meaningful review, the trial court made no specific finding of misconduct. Although the defendant's failure to comply with a discovery order constituted misconduct, the plaintiff did not establish what fees she incurred as a result. Misconduct cannot be predicated on a good-faith effort to admit evidence.

Affirmed in part, reversed in part, and remanded for further proceedings.

FITZGERALD, J., dissenting, stated that the prenuptial agreement was entered into at a time when prenuptial agreements in contemplation of divorce were considered to be against public policy. The Court of Appeals must consider the prenuptial agreement at the time it is to be enforced to determine whether the agreement is unfair and unreasonable as a result of unforeseeable changed circumstances. It would be unfair and inequitable to allow a party to leave a lengthy marriage with substantial assets that were acquired during the marriage as a result of the family's labor and to leave the other spouse, who not only contributed equally to the family income but also had responsibility for the children, with significantly less. The circumstances of the parties at the time of divorce are so far beyond those contemplated by the parties when the agreement was made that enforcement of the prenuptial agreement would work an injustice.

1. DIVORCE — PRENUPTIAL AGREEMENTS.

> A prenuptial agreement contemplating divorce is not void merely
> because it was entered into before the decision in *Rinvelt v Rinvelt*,
> 190 Mich App 372 (1991), recognizing such agreements.

2. DIVORCE — PRENUPTIAL AGREEMENTS — CHANGED CIRCUMSTANCES.

> If the parties agreed through a prenuptial agreement to acquire and
> maintain separate assets, the length of the parties' marriage and
> the fact that the parties' assets grew more significantly over the
> course of the marriage, with one party's assets growing more
> significantly, are not unforeseeable changed circumstances that
> justify voiding the prenuptial agreement.

3. TENANTS BY THE ENTIRETY — QUIT CLAIM DEED.

> A quitclaim deed by one spouse to a third party alone cannot convey
> the title vested in both spouses as tenants by the entirety (MCL
> 557.101).

4. PROPERTY — RECEIVERSHIP — TERMINATION.

> When a court has jurisdiction to appoint a receiver, but appoints the
> receiver in error, the trial court's order is voidable, not void; the
> trial court must fashion appropriate orders to terminate the
> receivership as may be equitable, but may make further findings of
> fact and enter such orders as are supported by those findings,
> including continuing the receivership if equitable to do so.

5. DIVORCE — ATTORNEY FEES — MISCONDUCT OF PARTY.

> An award of attorney fees incurred as a result of a party's unrea-
> sonable conduct in the course of divorce litigation requires a
> finding that the party's conduct is unreasonable because of mis-
> conduct, that a causal connection exists between that conduct and
> fees actually incurred by the other party, and that the fees so
> incurred are reasonable.

*Jaffe, Raitt, Heuer & Weiss, PC* (by *Sharon J. LaDuke* and *Susan S. Lichterman*), for the plaintiff.

*Thomasine Jefferson* for the defendant.

Before: MARKEY, P.J., and FITZGERALD and OWENS, JJ.

MARKEY, P.J. Defendant appeals by right a judgment of divorce entered May 16, 2003, that implemented the

trial court's opinion and order following a November 2002 trial. Defendant also appeals the trial court's pretrial order granting partial summary disposition to plaintiff and declaring the parties' May 1975 prenuptial agreement null and void. We conclude that the parties' prenuptial agreement is valid and that the trial court erred by finding that changed circumstances justified not enforcing it. This error affected many of the court's other rulings, including its determination of the marital estate, the equitable division of marital property, the appointment of a receiver, and possibly the trial court's decisions regarding child and spousal support. We therefore reverse in part, affirm in part, and remand this case to the trial court for further proceedings consistent with this opinion.

### I. SUMMARY OF FACTS AND PROCEEDINGS

Plaintiff and defendant were married on July 5, 1975. On or about May 15, 1975, the parties executed a prenuptial agreement, which provided, among other things, that each party was to have "complete control of his or her separate property" acquired "by either of them in an individual capacity" and that, in the event of a divorce, defendant was to be awarded the residence at 2460 Burns Avenue in the Indian Village area of Detroit. At the time of the agreement, plaintiff had been working for three years as an engineer for Detroit automakers, and defendant was a recent law school graduate employed in an entry-level tax analyst position. The parties' combined net worth at the time of their marriage in 1975 was less than $20,000.

Defendant established his own law practice in 1976, which remains viable today. Plaintiff worked for the Detroit Edison Company off and on for a total of twenty-one years before retiring in 1997. From 1977 to

2000, the parties' respective total incomes were nearly identical: plaintiff earned $1,058,318, and defendant earned $1,063,626.

Before retiring from Detroit Edison, plaintiff sued Detroit Edison for discrimination. That lawsuit was settled in 1997. She received a gross cash payment of $773,770 for a total settlement of $1,068,423. According to plaintiff, much of the net cash settlement proceeds, $392,669, was used to pay outstanding debts the parties had accumulated, living expenses, college tuition for their children, and a down payment on a new residence.

Defendant initially practiced law from the family home and later moved into an office at 225 Garfield in Detroit. The Garfield building also housed various other profit and nonprofit entities defendant established. In 1991, the city of Detroit initiated condemnation proceedings against the Garfield property. In March 2001, a consent judgment was entered in the condemnation action, and the city agreed to pay $1.25 million for the property.

Plaintiff filed this divorce action in October 2000. Defendant, relying on the 1975 prenuptial agreement, contended that he was entitled to everything he purchased over the course of the parties' lengthy marriage.

Plaintiff moved for partial summary disposition, asserting that the 1975 prenuptial agreement is unenforceable. Plaintiff claimed that defendant failed to fully disclose his assets to plaintiff before she signed the agreement, that the agreement defendant submitted is not the same agreement she signed, and that because of the change in the parties' circumstances between the time the agreement was signed and the time of the divorce, it would be unfair and unconscionable to enforce the agreement as interpreted by defendant.

Defendant responded that the parties voluntarily entered into the prenuptial agreement, that all assets were fully disclosed when the agreement was signed, and that the circumstances of the parties have not changed to an extent that it would be unfair to enforce the agreement. Defendant claimed that the agreement was necessary because plaintiff did not save money. Moreover, the parties had abided by the terms of the agreement during the marriage. Defendant stated that each party maintained separate accounts, purchased property separately, and that plaintiff executed quit-claim deeds to defendant to extinguish her dower rights in his property. Defendant also claimed that there has been no change in circumstances that would prevent plaintiff from earning adequate income from her investments and business interests or from working as an engineer should she choose to do so.

The trial court held a hearing on plaintiff's motion on August 23, 2002, and, at the conclusion of the hearing, granted plaintiff's motion. On September 23, 2002, the trial court entered its order granting partial summary disposition to plaintiff, declaring the prenuptial agreement "null and void for the reasons stated on the record." At the motion hearing, the trial court had noted that the only provision in the agreement that expressly contemplated divorce related to the property on Burns, suggested the agreement was infirm because it was entered into when agreements contemplating divorce were not yet valid, and ruled the "real reason why I have to strike down this agreement is . . . that . . . the facts and circumstances have changed since the agreement was executed making its enforcement unfair and unreasonable . . . ."

The trial of this case commenced on November 6, 2002, and concluded on December 3, 2002. The court

issued its opinion and order on April 28, 2003, setting forth its findings of fact and conclusions of law. The trial court determined the marital estate to consist of the following property:

(1) A condominium in Harbor Springs, Michigan, valued at $110,595.

(2) Defendant's one-half interest in an office building located at 1201 Bagley, Detroit, valued at $175,000.

(3) Stocks and other investments valued at $21,856.

(4) The net proceeds of the condemnation of the property at 225 Garfield, Detroit, valued at $887,117.

(5) Detroit Edison pension annuities and worker's compensation valued at $172,845.

(6) A SEP and IRAs in the amount of $215,874.

(7) Savings and miscellaneous in the amount of $7,900.

(8) 383.92 acres of land located in Springfield Township, Oakland County, with an estimated value between $2.9 million and $3 million if sold undeveloped and, if sold developed, between $8 million and $10 million.

(9) The marital residence at 2460 Burns, Detroit, valued at $543,449 according to its 2002 state equalized valuation or $450,000 as appraised.

(10) Defendant's law practice with a value estimated at $55,059 because defendant did not provide expert evaluator John Stockdale necessary financial information.

(11) Plaintiff's business, VTR Consulting Inc., valued at $950 by Mr. Stockdale.

(12) Malcolm X papers, valued by the parties at $125,000.

(13) Plaintiff's incurred debt in the amount of $180,000.

The trial court rejected defendant's claims that much of this property should be excluded from the marital estate. Specifically, the trial court rejected defendant's claims that plaintiff had deeded away her interest in the Harbor Springs and Garfield properties, that various profit and nonprofit entities should share in the condemnation proceeds, that a partnership owned 227.54 acres of the Oakland County property and defendant held only a partnership interest, that a corporation in which defendant had no interest owned the remaining 156.38 acres of Oakland County property, and that one of defendant's nonprofit entities actually owned the Malcolm X papers. The trial court found defendant owned the 227.54 acres and owned at least a one-third interest in the other 156.38 acres. The trial court ordered that the marital estate be divided equally and appointed a receiver to sell all the Oakland County property, with fifty-five percent of the net proceeds of defendant's interest to be distributed to plaintiff to equalize the distribution of the marital estate between the parties.

The trial court also rejected plaintiff's request for an award of $400 a week in spousal support, finding that the division of the marital estate would give each party sufficient assets to maintain a high standard of living.

Plaintiff was awarded custody of the parties' one remaining minor child, and the child support previously set was continued.

Finally, the trial court ordered defendant to pay $150,000 of plaintiff's attorney fees because she had "been forced to incur expenses as a result of the other party's unreasonable conduct in the course of the litigation," citing *Ianitelli v Ianitelli,* 199 Mich App 641; 502 NW2d 691 (1993).

## II. THE PRENUPTIAL AGREEMENT

### A. PRESERVATION AND STANDARD OF REVIEW

Plaintiff argues that defendant failed to cite authority to support his position on this issue and, therefore, failed to preserve it. See, e.g., *Korth v Korth*, 256 Mich App 286, 294; 662 NW2d 111 (2003). But defendant cites *Booth v Booth*, 194 Mich App 284; 486 NW2d 116 (1992), which in turn relied on *Rinvelt v Rinvelt*, 190 Mich App 372; 475 NW2d 478 (1991), and *Brooks v Brooks*, 733 P2d 1044 (Alas, 1987). Defendant also cites *Kuziemko v Kuziemko*, unpublished opinion per curiam of the Court of Appeals issued December 4, 2001 (Docket No. 212377). In rendering its decision voiding the prenuptial agreement, the trial court relied on *Rinvelt, Brooks,* and *Kuziemko*. Defendant argues on appeal that the trial court misapplied this case authority. We conclude that defendant has preserved this issue by citing authority in support of his argument and by arguing in the trial court that the parties voluntarily entered into the prenuptial agreement, that the parties voluntarily complied with its terms during the marriage, and that changed circumstances did not render the agreement either unfair or unreasonable. *Fast Air, Inc v Knight*, 235 Mich App 541, 549; 599 NW2d 489 (1999).

A motion for summary disposition based on MCR 2.116(C)(10) tests the factual support for a claim and must be supported by affidavits, depositions, admissions, or other documentary evidence. MCR 2.116(G)(3)(b); *Patterson v Kleiman*, 447 Mich 429, 432; 526 NW2d 879 (1994). The moving party must specifically identify the undisputed factual issues and support its position with evidence. MCR 2.116(G)(4); *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999).

The trial court must consider the submitted evidence in the light most favorable to the nonmoving party, but may not make findings of fact or weigh credibility in deciding the motion. *Id.*; *Skinner v Square D Co*, 445 Mich 153, 161; 516 NW2d 475 (1994). If the moving party fulfills its initial burden, the party opposing the motion then must demonstrate with supporting evidence that a genuine and material issue of disputed fact exists. MCR 2.116(G)(4); *Maiden, supra* at 120-121. In the absence of any genuine issue of material fact, summary disposition may be granted to the party entitled to it as a matter of law. MCR 2.116(G)(4) and (I)(1) and (2).

We review de novo a trial court's grant or denial of summary disposition. *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 463; 663 NW2d 447 (2003). Also, the interpretation of a contract is a question of law reviewed de novo on appeal, including whether the language of a contract is ambiguous and requires resolution by the trier of fact. *Id.* at 463, 469, 480. An unambiguous contract must be enforced according to its terms. *Wilkie v Auto-Owners Ins Co*, 469 Mich 41, 51-52; 664 NW2d 776 (2003).

### B. ANALYSIS

We find that the parties' prenuptial agreement is clear, unambiguous, and valid. The trial court erred by finding that changed circumstances justified not enforcing it.

In addition to voiding the parties' prenuptial agreement because "the facts and circumstances have changed since the agreement was executed making its enforcement unfair and unreasonable," the trial court also suggested the agreement might be invalid because agreements that contemplated divorce were not recog-

nized in Michigan until 1991. Before then, the appellate courts of this state had recognized only prenuptial agreements that governed the division of property upon the death of a spouse. *Rinvelt, supra* at 375. But it does not necessarily follow that the 1975 prenuptial agreement in this case was void *ab initio* because it governed the disposition of property in the event of divorce. Although our Supreme Court had stated that prenuptial agreements in contemplation of divorce were against public policy, see e.g., *Scherba v Scherba*, 340 Mich 228, 231; 65 NW2d 758 (1954), the *Rinvelt* Court rejected such statements as dicta, determining that the concerns that had led some courts to refuse to enforce such agreements were no longer valid. *Rinvelt, supra* at 379. Further, this Court in *Lizzio v Lizzio*, unpublished opinion per curiam of the Court of Appeals, issued December 14, 1999 (Docket No. 203018), slip op at 6, noted "there was no established rule of law in 1975 precluding the enforceability of an antenuptial agreement contemplating divorce." Thus, no clear authority supports the conclusion that the parties' 1975 prenuptial agreement is void merely because it was entered into before *Rinvelt* was decided. The trial court's suggestion to the contrary is wrong.

The trial court correctly recognized, however, that it is now well established that prenuptial agreements governing the division of property in the event of a divorce are recognized in Michigan. *Booth, supra* at 288; *Rinvelt, supra* at 382; see, also, MCL 557.28. But such agreements may be voided if certain standards of " 'fairness' " are not satisfied. *Rinvelt, supra* at 380-381, quoting *Brooks, supra* at 1049. A prenuptial agreement may be voided (1) when obtained through fraud, duress, mistake, or misrepresentation or nondisclosure of material fact, (2) if it was unconscionable when executed, or (3) when the facts and circumstances are so

changed since the agreement was executed that its
enforcement would be unfair and unreasonable. *Rin-
velt, supra* at 380, citing *Brooks, supra* at 1049. A party
challenging a prenuptial agreement "bears the burden
of proof and persuasion." *Rinvelt, supra* at 382. See,
also, *In re Benker Estate*, 416 Mich 681, 684; 331 NW2d
193 (1982), and *Booth, supra* at 289.

In this case, the trial court voided the prenuptial
agreement because it found that the facts and circum-
stances had so changed since the agreement was ex-
ecuted that its enforcement would be unfair and unrea-
sonable. Relying on *Kuziemko,* the trial court reasoned
that "foreseeability" was the critical issue in making
this determination. Thus, the trial court believed it
"should enforce specific terms of the agreement if the
circumstances at the time that the marriage ends were
what the parties foresaw at the time they entered the
prenuptial agreement." The trial court concluded that,
"given the duration of this marriage, 26 years, the age
and financial status of the parties at the time they
signed the agreement, and the significant changes in
the financial status of both parties since that time, I
believe it would be both unfair and unconscionable to
enforce an agreement executed 26 years earlier under
far different facts and circumstances and certainly with
a marital estate that could not have possibly been
foreseen to have grown to the proportion that it has by
these parties." In sum, the trial court found that the
length of the parties' marriage and each party's acqui-
sition of substantial assets during the marriage were
unforeseeable changed circumstances rendering it un-
fair and unreasonable to enforce the parties' prenuptial
agreement.

The trial court properly utilized this Court's decision
in *Kuziemko*. Although that case is an unpublished

opinion that lacks binding precedential effect under the rule of stare decisis, MCR 7.215(C)(1), its reasoning is persuasive and instructive on the issue presented in this case. See, e.g., *Slater v Ann Arbor Pub Schools Bd of Ed*, 250 Mich App 419, 432; 648 NW2d 205 (2002). The trial court properly determined that the first step in analyzing whether changed circumstances might justify refusing to enforce a prenuptial agreement is to focus on whether the changed circumstances were foreseeable when the agreement was made. *Kuziemko, supra*, slip op at 5, quoting *Gant v Gant*, 174 W Va 740, 748; 329 SE2d 106 (1985). Hence, for " 'a change of circumstances to be uncontemplated, the event must not have been reasonably foreseen by the parties prior to or at the time of the making of the agreement.' " *Kuziemko, supra*, slip op at 5, quoting *Warren v Warren*, 147 Wis 2d 704, 708-709; 433 NW2d 295 (Wis App, 1988). This approach precludes the judiciary from substituting their own subjective views of "fairness" contrary to an express written agreement.

In *Kuziemko*, the trial court had refused to enforce the parties' prenuptial agreement, finding it would be unfair and unreasonable to do so because of the short duration of the marriage in that case. *Kuziemko, supra*, slip op at 3. This Court disagreed, *id.*, slip op at 4, opining:

> Antenuptial agreements are subject to the rules of construction applicable to contracts in general. Antenuptial agreements, like other written contracts, are matters of agreement by the parties, and the function of the court is to determine what the agreement is and enforce it. Clear and unambiguous language may be [sic] not rewritten under the guise of interpretation; rather, contract terms must be strictly enforced as written, and unambiguous terms must be construed according to their plain and ordinary meaning. If the agreement fairly admits of but one interpreta-

tion, even if inartfully worded or clumsily arranged, it is not unambiguous [sic]. [Citations omitted.]

The *Kuziemko* Court continued, *id.*, slip op at 4-5:

"Prenuptial agreements . . . provide . . . people with the opportunity to ensure predictability, plan their future with more security, and, most importantly, decide their own destiny. Moreover, allowing couples to think through the financial aspects of their marriage beforehand can only foster strength and permanency in that relationship. In this day and age, judicial recognition of prenuptial agreements most likely 'encourages rather than discourages marriage.'

"In sum, both the realities of our society and policy reasons favor judicial recognition of prenuptial agreements. . . . [W]e see no logical or compelling reason why public policy should not allow two mature adults to handle their own financial affairs. Therefore, we join those courts that have recognized that prenuptial agreements legally procured and ostensibly fair in result are valid and can be enforced. 'The reasoning that once found them contrary to public policy has no place in today's matrimonial law.' [*Rinvelt, supra* at 382, quoting *Brooks v Brooks*, 733 P2d 1044 (Alas, 1987).]"

Courts cannot make contracts. They can only construe them. *Morales v Auto Owners Ins. Co.*, 458 Mich 288, 297, fn 3; 582 NW 2d 776 (1998) quoting *Ruddock v Detroit Life Ins Co*, 209 Mich 638, 654-655, 177 NW 242 (1920). In keeping with this principle, it necessarily follows that parties who negotiate and ratify antenuptial agreements should do so with the confidence that their expressed intent will be upheld and enforced by the courts.

In this case, the trial court erred in its application of the principles stated in *Kuziemko*. First, the trial court erred by finding that the length of the parties' marriage was a change in circumstance that justified voiding the prenuptial agreement. Although, in *Kuziemko*, the parties were not married long and the parties' financial

status had not significantly changed from when the agreement was entered into, the Court rejected the idea that the brevity of the marriage justified voiding the parties' agreement. *Kuziemko, supra,* slip op at 4-5. The Court opined, "[N]either the short duration of the parties' marriage nor the benefit [the] defendant may receive under the agreement, individually or collectively, would constitute a change in facts or circumstances justifying departure from the parties' agreement." *Id.,* slip op at 4. Likewise here, neither the length of the parties' marriage nor the perceived benefit to defendant justifies voiding the parties' prenuptial agreement. A long marriage, which is, indeed, the whole idea of marriage, is as easily foreseen as a short marriage. Accordingly, the trial court erred by concluding the length of the parties' marriage justified voiding the parties' agreement.

The trial court also erred by finding that the growth of the parties' assets over the years justified voiding their prenuptial agreement. The heart of the prenuptial agreement is found in paragraph three, which provides that the parties agree to maintain their separate property as if not married:

> Separate Property. Except as herein provided, each party shall have complete control of his or her separate property, and may enjoy and dispose of such property in the same manner as if the marriage had not taken place. The foregoing shall apply to all property now owned by either of the parties and to all property which may hereafter be acquired by either of them in an individual capacity.

In essence, the parties agreed to be captains of their own financial ships and to " 'decide their own destiny.' " *Rinvelt, supra* at 381, quoting *Brooks, supra* at 1050. Having agreed to do so, it was clearly foreseeable at the time the agreement was entered into that the parties

would acquire separate assets over the course of the marriage. Further, that the parties' separate assets could grow at disparate rates and that one party's assets might grow significantly more than the other party's would have been readily apparent. In sum, the fact that the parties' assets grew significantly over many years can hardly be considered an unforeseeable changed circumstance that justifies voiding the parties' prenuptial agreement. Similarly, the benefit accruing to one party from the disparate growth of his assets is simply not a changed circumstance rendering the agreement unfair and unreasonable to enforce.

The parties' prenuptial agreement is clear and unambiguous; changed circumstances do not render its enforcement unfair and unreasonable. Accordingly, the agreement should be enforced. Moreover, the trial court incorrectly suggested that the only provision of the agreement mentioning divorce, and therefore applicable in that event, is paragraph two pertaining to the parties' marital home. Although it is true that paragraph two is the only part of the agreement that specifically mentions divorce, we must read the agreement as a whole. When so read, the agreement clearly contemplates more than the parties' marital home. *Perry v Sied*, 461 Mich 680, 689 n 10; 611 NW2d 516 (2000). Indeed, paragraph three, read in the context of the whole agreement, provides that property of each spouse "which may hereafter be acquired by either of them in an individual capacity" will remain the acquiring spouse's separate property.

Of course, the question remains whether defendant rather than plaintiff was entitled to partial summary disposition. MCR 2.116(I)(2). For several reasons, we conclude that the answer to that question is yes. First, as the party challenging the prenuptial agreement,

plaintiff "bears the burden of proof and persuasion." *Kuziemko, supra,* slip op at 4, citing *Rinvelt, supra* at 382. Second, plaintiff acknowledged having signed a prenuptial agreement, but offered no evidence to call into question the authenticity of the document defendant produced. For the same reason, plaintiff's argument that defendant produced only a copy of the agreement instead of the original is without merit. MRE 1003. Plaintiff only claimed that the terms of the prenuptial agreement she signed were different from those in the document defendant produced. But the problem with plaintiff's testimony is that a party to a written contract that is clear and unambiguous may not vary its terms with parol evidence. *Meagher v Wayne State Univ,* 222 Mich App 700, 722; 565 NW2d 401 (1997). Although parol or other extrinsic evidence may be admitted as an aid to interpret a written agreement that is open to two reasonable constructions, *Klapp, supra* at 469-470, such is not the case here.

With respect to plaintiff's motion for partial summary disposition, she bore the burden of persuasion to establish not only that the prenuptial agreement was void, but also that no genuine issue of material fact existed in that regard. *Smith v Globe Life Ins Co,* 460 Mich 446, 455; 597 NW2d 28 (1999). Plaintiff failed to do so with respect to her claim that changed circumstances rendered the agreement unfair and unreasonable to enforce, and her effort to show that the terms of the parties' agreement were different from those of the written contract defendant produced also fails.

Plaintiff also argues that the prenuptial agreement was void because (1) defendant did not fully disclose his assets at the time the agreement was entered and (2) plaintiff was not represented by counsel. Yet, it is undisputed that, at the time the agreement was entered

into, plaintiff and defendant were both young professionals just starting their careers with combined assets of less than $20,000. Plaintiff conceded that the parties started their marriage with virtually no assets. Further, plaintiff does not claim that any alleged discrepancy between defendant's disclosure of assets and the true state of his net worth at the time of the agreement had any effect whatsoever on her entering into the prenuptial agreement. So, even if defendant failed to completely disclose all his assets to plaintiff, any shortfall was immaterial when viewed in light of the parties' relatively small estate when they married. Accordingly, the alleged lack of disclosure cannot serve as a basis for voiding the prenuptial agreement under the fairness doctrine. See *In re Benker Estate, supra* at 689-691.

Plaintiff's lack of counsel before entering into the prenuptial agreement also provides no basis for voiding it. As noted above, prenuptial agreements are contracts subject to the rules governing construction of contracts generally. *Kuziemko, supra*, slip op at 4, citing *In re Hepinstall's Estate*, 323 Mich 322, 327-328; 35 NW2d 276 (1948). Provided the rules of fairness discussed above are not offended, there is no requirement that one be represented by independent counsel before committing to a binding contract. *Gant, supra* at 745. According to plaintiff's own testimony, her will was not overcome; indeed, she actively negotiated the terms of the agreement. So, plaintiff's lack of counsel does not require voiding the parties' agreement.

In summary, the parties' prenuptial agreement is valid, and the trial court erred by finding that changed circumstances justified not enforcing it. We, therefore, must reverse and remand for further proceedings in the trial court.

### III. THE MARITAL ESTATE

#### A. PRESERVATION AND STANDARD OF REVIEW

No special action was necessary to preserve this issue. MCR 2.517(A)(7). Moreover, defendant preserved this issue by raising it in the trial court. *Fast Air, supra* at 549.

In granting a divorce judgment, the trial court must make findings of fact and dispositional rulings. *Sands v Sands*, 442 Mich 30, 34; 497 NW2d 493 (1993). The trial court's factual findings will not be reversed unless they are clearly erroneous, i.e., if this Court is left with the definite and firm conviction that a mistake has been made. *Id.*; *Draggoo v Draggoo*, 223 Mich App 415, 429; 566 NW2d 642 (1997). If this Court upholds the trial court's findings of fact, it must then decide whether the dispositional ruling was fair and equitable in light of those facts. *Sparks v Sparks*, 440 Mich 141, 151-152; 485 NW2d 893 (1992). The trial court's dispositional ruling is discretionary and will be affirmed unless this Court is left with the firm conviction that it was inequitable. *Id.* at 152; *Draggoo, supra* at 429-430.

#### B. ANALYSIS

Because the trial court erred by not enforcing the parties' prenuptial agreement, it also erred in the first step necessary to equitably divide the parties' property: determining what property is included in the marital estate and what property is separate property of a party. "[T]he trial court's first consideration when dividing property in divorce proceedings is the determination of marital and separate assets." *Reeves v Reeves*, 226 Mich App 490, 493-494; 575 NW2d 1 (1997). The trial court's not enforcing the parties' prenuptial agreement clearly affected the segregation of marital and separate prop-

erty. Accordingly, we must remand for further proceedings. Nevertheless, because defendant's arguments regarding the marital estate will again arise, we will briefly address them.

The crux of defendant's appeal is that the trial court wrongly included the following as marital assets: (a) proceeds resulting from the city of Detroit's condemnation of the property at 225 Garfield; (b) a condominium in Harbor Springs; (c) property in Springfield Township, Oakland County, consisting of 227.54 acres (this property was purchased on a land contract by AHR Packaging Consultants, a corporation solely owned by defendant, but deeded on payment of the contract to an alleged limited partnership, Equestrian Estates, Ltd [EE I]); (d) property in Springfield Township, Oakland County, consisting of 156.38 acres (this property, adjacent to the EE I property, was purchased on land contract by a Michigan corporation defendant created, Equestrian Estates II, Ltd [EE II]), which defendant claimed was owned by two shareholders, Rick Frazier and O'Neil Swanson; and (e) certain Malcolm X papers that defendant purchased and purportedly gave to one of his nonprofit entities as a gift.[1] Defendant also asserts that the trial court wrongly failed to include (f) certain of defendant's debts in the marital estate.

The distribution of property in a divorce is controlled by statute. *Korth, supra* at 291; *Reeves, supra* at 493. MCL 552.19 provides that upon granting a divorce, "the court may make a further judgment for restoring to

---

[1] Defendant created and operated several profit and nonprofit entities, as well as various assumed names, including AHR Packaging Consultants, Development Unlimited Inc., Equestrian Estates Ltd., Equestrian Estates II Ltd., GJR Productions, Gregory J. Reed & Associates, Gregory J. Reed Scholarship Foundation, Keeper of the Word Foundation, Mic-Arian Corp., New National Publishing Co., Parks Legacy Mission, Peaceful Enterprises, and Progressive Clergy.

either party the whole, or such parts as it shall deem just and reasonable, of the real and personal estate that shall have come to either party by reason of the marriage, or for awarding to either party the value thereof . . . in money." The goal of a court when apportioning a marital estate is to equitably divide it in light of all the circumstances. *Byington v Byington*, 224 Mich App 103, 114; 568 NW2d 141 (1997). The trial court need not achieve mathematical equality, but the trial court must clearly explain divergence from congruence. *Id.* at 114-115.

In general, assets a spouse earns during the marriage are properly considered part of the marital estate, and thus subject to equitable division. And the parties' separate assets may not be invaded unless one of two statutory exceptions is satisfied. *Korth, supra* at 291. The first exception, found in MCL 552.23(1), permits the trial court to invade a spouse's separate property when, after the division of the marital assets, "the estate and effects awarded to either party are insufficient for the suitable support and maintenance of either party . . . ." See *Korth, supra* at 291; *Reeves, supra* at 494. In other words, "invasion is allowed when one party demonstrates additional need." *Id.* The second exception, MCL 552.401, permits the trial court to invade a spouse's separate property when the other spouse "contributed to the acquisition, improvement, or accumulation of the property." See *Korth, supra* at 291-292; *Reeves, supra* at 494-495. "When one [spouse] significantly assists in the acquisition or growth of [the other] spouse's separate asset, the court may consider the contribution as having a distinct value deserving of compensation." *Id.* at 495. When this exception applies, the trial court may award to the contributing spouse all or a part of the separate property of the other spouse as

the court determines "to be equitable under all the circumstances of the case . . . ." MCL 552.401; *Korth, supra* at 292.

First, the parties' prenuptial agreement does not exclude their home on Burns from the marital estate. The agreement provides that "[i]n the event of divorce . . . [defendant] shall be awarded the residence . . . ." Thus, the trial court did not err by including the marital home in the marital assets but awarding it to defendant subject to plaintiff's receipt of her share of its equity.

Second, after a careful review of the record, we are convinced that the evidence generally supported the trial court's finding that defendant, his purported partners in the Oakland County property, and the documents defendant produced to support his claims all lacked credibility. MCR 2.613(C). Defendant's testimony attempting to explain the legal machinations of various purported partnerships, assumed-name entities, and corporations regarding the purchase of the EE I and EE II properties at times bordered on double-talk. For example, defendant asserted that the EE I property was partnership property purchased by AHR Packaging Consultants because the partnership did not exist and stock certificates in AHR were issued as liens to secure partnership interests. Defendant's testimony explaining why the purported partnership agreement included a defunct assumed-name entity as a general partner was equally mystifying.

With respect to the documents defendant produced, we conclude that the purported partnership documents were inconsistent and were not in the proper form or filed according to the Michigan Revised Uniform Limited Partnership Act, MCL 449.1101 *et seq.* Likewise, copies of "cancelled" checks purportedly representing

investments by others in the EE I and EE II properties bear no indicia of having been processed through the banking system. In sum, this record does not establish that the trial court clearly erred in deciding that these documents were not credible. *Sands, supra* at 34.

### (a) 225 GARFIELD CONDEMNATION PROCEEDS

The trial court did not clearly err by including the 225 Garfield condemnation proceeds as a marital asset. The prenuptial agreement does not exclude this property from the marital estate because the parties acquired 225 Garfield as tenants by the entirety. Thus, 225 Garfield does not come within the "separate property" paragraph of the prenuptial agreement because it was not "acquired by either [party] in an individual capacity." Defendant also misplaces his reliance on a May 21, 1991, quitclaim deed in which plaintiff purported to grant her interest in 225 Garfield to one of defendant's nonprofit entities. Under MCL 557.101,[2] which governs termination of a tenancy by the entirety, the quitclaim deed was invalid. "Neither husband nor wife alone can convey title vested in them as tenants by the entireties." *French v Foster*, 307 Mich 361, 364; 11 NW2d 920 (1943). Further, defendant acknowledged plaintiff's assistance and support regarding the Garfield property.

The trial court also did not clearly err by determining that defendant failed to establish that other entities should share in the condemnation proceeds. Although defendant produced evidence that Charles Brown owned fifty percent of Mic-Arian Corporation stock and

---

[2] MCL 557.101 provides, "In all cases where husband and wife own any interest in land as tenants by the entirety, such tenancy by the entirety may be terminated by a conveyance from either one to the other of his or her interest in the land so held."

that Mic-Arian owned the building to which defendant moved his business activity, defendant provides no evidence that Mic-Arian held any interest in the condemnation proceeds for 225 Garfield. Likewise, other than the fact that many of defendant's profit and nonprofit entities were named as defendants in the condemnation case and as payees on the settlement check, defendant offers no argument to establish that these other entities held an interest in the condemnation proceeds. On the other hand, this Court held in the condemnation case that defendant was "either an officer or managing agent of every defendant" in that case. *Detroit v Williams*, unpublished opinion per curiam of the Court of Appeals, issued April 25, 1997 (Docket No. 188458), slip op at 2. Furthermore, Gregory Buss, the attorney representing defendant and the other named entities in the condemnation action and escrow agent of the settlement, testified that defendant either owned or controlled all the named condemnation defendants. So, the trial court did not clearly err by finding, in essence, that defendant and his various entities were one and the same, and by including the 225 Garfield condemnation proceeds in the marital estate.

### (b) HARBOR SPRINGS CONDOMINIUM

The trial court did not clearly err by including the Harbor Springs condominium as a marital asset. Similar to its treatment of the Garfield property, the prenuptial agreement does not exclude the Harbor Springs condominium from the marital estate because the parties also acquired it as tenants by the entirety. A quitclaim deed purportedly signed by plaintiff conveying her interest in the property to defendant at most severed the tenancy by the entirety. MCL 557.101. It did

not bring the property within the terms of the prenuptial agreement because the property was still acquired by defendant as a married man, not in his individual capacity. Plaintiff also presented evidence that she directly and indirectly contributed to the maintenance of this property. "In granting a divorce, the court may divide all property that came 'to either party *by reason of the marriage . . . .*' " *Reeves, supra* at 493, quoting MCL 552.19 (emphasis in *Reeves*). Further, property earned by one spouse while married is presumed to be marital property. *Byington, supra* at 112. For these reasons, the trial court did not clearly err by including the Harbor Springs condominium as part of the marital estate.

### (c) AND (d) OAKLAND COUNTY PROPERTY AND (e) MALCOLM X PAPERS

All of the Oakland County property, as well as the Malcolm X papers, is excluded from the marital estate by the prenuptial agreement. Although the testimony and documents defendant presented regarding this property were less than credible, it is undisputed that defendant acquired this property either in his individual capacity or through one of the entities he controlled. Accordingly, the trial court clearly erred by including this property in the marital estate without factual findings that one of the two statutory exceptions permitting invasion of separate property was applicable. *Korth, supra* at 291-292; *Reeves, supra* at 494-495.

### (f) DEFENDANT'S DEBTS

Defendant has not established that the trial court clearly erred because his purported debts were not included in the marital estate. The authority defendant cites, *Lesko v Lesko*, 184 Mich App 395, 401; 457 NW2d

695 (1990), does not support his argument that the trial court was required to include his debt in the marital estate. *Lesko* did not hold that a trial court has a duty to include the parties' debts when apportioning the marital estate. Instead, the *Lesko* Court held that the trial court, after weighting the credibility of witnesses, could determine that alleged " 'joint' " debts were actually the individual responsibility of one of the parties. *Id.* at 400-401. Because defendant did not cite authority to support his argument, he has abandoned it. *Prince v MacDonald*, 237 Mich App 186, 197; 602 NW2d 834 (1999).

IV. THE EQUITABLE DIVISION OF THE MARITAL ASSETS

Because the trial court erred in the first necessary step to making an equitable division of property, determining what property should be included in the marital estate and what property is separate property of a party, *Reeves, supra* 493-494, it is premature to address this issue.

V. ADJUDICATING RIGHTS OF NONPARTIES

A. PRESERVATION AND STANDARD OF REVIEW

Defendant preserved this issue. *Fast Air, supra* at 549. A claim that the lower court lacks jurisdiction is a question of law, which this Court reviews de novo. *Ryan v Ryan*, 260 Mich App 315; 331; 677 NW2d 899 (2004). Also, whether constitutional due process applies and, if so, has been satisfied are legal questions reviewed de novo. *Thomas v Deputy Warden,* 249 Mich App 718, 724; 644 NW2d 59 (2002).

B. ANALYSIS

Absent allegations of fraud, the trial court in a divorce action may only adjudicate the rights of the

spouses whose marriage is being dissolved. *Berg v Berg*, 336 Mich 284, 288; 57 NW2d 889 (1953); *Smela v Smela*, 141 Mich App 602, 605; 367 NW2d 426 (1985). Thus, the trial court's jurisdiction is limited to the dissolution of the marriage, *Ryan, supra* at 332, and to matters ancillary to the marriage's dissolution, such as child support, spousal support, an equitable division of marital assets, and the award to one spouse of the other spouse's property in certain circumstances. See *Korth, supra* at 291-292; *Reeves, supra* at 494-495. So, in a divorce action, the trial court lacks the authority " 'to compel a party to convey property or a property interest to a third person, even a child of the parties, or to adjudicate claims of third parties.' " *Hoffman v Hoffman*, 125 Mich App 488, 490; 336 NW2d 34 (1983), quoting *Krueger v Krueger*, 88 Mich App 722, 725; 278 NW2d 514 (1979).

But, in this case, the trial court did not adjudicate the rights of third parties, *Smela, supra*, or order that property be conveyed to third parties, *Hoffman, supra*. To the contrary, the trial court only determined the extent of defendant's interest in various properties for the purpose of adjudicating a fair and equitable division of marital property. The trial court need not ignore reality when defendant obfuscates his various property holdings through a maze of real or nonexistent entities. See, e.g., *Gates v Gates*, 256 Mich App 420, 428; 664 NW2d 231 (2003), in which the trial court properly "considered the reality of the situation surrounding ownership of [a] house and who made payments on [it] and awarded the property to [the] plaintiff at a zero value, because the $58,559 equity in the home was achieved solely through payments made by [the plaintiff's brother and sister-in-law]."

Defendant's claim that the trial court's actions deprived others of their rights to due process is equally without merit. Both the Michigan Constitution and the United States Constitution preclude the government from depriving a person of life, liberty, or property without due process of law. US Const, Am V; Const 1963, art 1, § 17; *Hinky Dinky Supermarket, Inc v Dep't of Community Health,* 261 Mich App 604, 605; 683 NW2d 759 (2004). But constitutional rights are personal, and a person generally cannot assert the constitutional rights of others. *In re Chmura,* 461 Mich 517, 530; 608 NW2d 31 (2000); *Fieger v Comm'r of Ins,* 174 Mich App 467, 471; 437 NW2d 271 (1988). "A plaintiff must assert his own legal rights and interests and cannot rest his claim to relief on the legal rights or interests of third parties." *Id.*

Moreover, due process is a flexible concept, *Thomas, supra* at 724, the essence of which is to ensure fundamental fairness, *In re Adams Estate,* 257 Mich App 230, 233-234; 667 NW2d 904 (2003). Procedure in a particular case is constitutionally sufficient when there is notice of the nature of the proceedings and a meaningful opportunity to be heard by an impartial decision maker. *Id.* at 234; *Hinky Dinky Supermarket, supra* at 606. Here, the individuals who defendant asserts were not accorded due process possessed no direct claim to the disputed property. Their claim is only indirect through alleged partnerships with defendant, to whom they deferred to manage their investment. Even Rick Frazier, who purportedly owned a majority of the stock of Equestrian Estates II Ltd., asserted his rights were determined by a partnership agreement and that defendant was the managing partner. Likewise, ample evidence supported the trial court's finding that defendant either owned or controlled the various profit and non-

profit entities with purported interests in the disputed property. Accordingly, defendant and the other various interests he represented had notice and opportunity for a meaningful hearing conducted with fundamental fairness.

## VI. ALLEGED EVIDENTIARY ERROR

### A. PRESERVATION AND STANDARD OF REVIEW

Defendant failed to preserve his claim that the trial court did not timely decide the admissibility of evidence when he failed to properly raise it in the trial court. *Fast Air, supra* at 549. Indeed, by not creating and providing this Court with a record of the trial court's decision, defendant has waived this issue. MCR 7.210(B); *People v Elston*, 462 Mich 751, 762; 614 NW2d 595 (2000); *Nye v Gable, Nelson & Murphy*, 169 Mich App 411; 425 NW2d 797 (1988).

A trial court's ruling on the admission or exclusion of evidence is reviewed for an abuse of discretion. *Barrett v Kirtland Community College*, 245 Mich App 306, 325; 628 NW2d 63 (2001). An abuse of discretion exists if the trial court's decision is so palpably and grossly contrary to fact and logic that it evidences a perversity of will, a defiance of judgment, or the exercise of passion or bias. *Id.* Thus, ordinarily, the trial court's decision on a close evidentiary question cannot be an abuse of discretion. *Lewis v LeGrow*, 258 Mich App 175, 200; 670 NW2d 675 (2003). Further, even if the trial court errs in admitting or excluding evidence, reversal is warranted only if a substantial right of a party is affected and it affirmatively appears that failing to grant relief would be inconsistent with substantial justice. MCR 2.613(A); *Miller v Hensley*, 244 Mich App 528, 531; 624 NW2d 582 (2001).

B. ANALYSIS

Defendant waived this issue by not presenting a complete record for review. Moreover, defendant failed to establish that his substantial rights were affected by the trial court's ruling regarding the documents at issue. The authenticity of the documents depended on the credibility of defendant and his purported partners. But the trial court determined that both the witnesses and the documents lacked credibility. MCR 2.613(C). Accordingly, whether the trial court admitted or excluded the documents did not affect the outcome or defendant's substantial rights.

VII. APPOINTMENT OF A RECEIVER

A. PRESERVATION AND STANDARD OF REVIEW

Defendant preserved this issue. *Fast Air, supra* at 549. A trial court's order appointing a receiver should be set aside only when the court clearly abuses its discretion. *Burton v May*, 297 Mich 571, 574; 298 NW 286 (1941).

B. ANALYSIS

A circuit court has broad jurisdiction to appoint a receiver in an appropriate case. MCL 600.601, 600.605, 600.611, and 600.2926; *Petitpren v Taylor School Dist*, 104 Mich App 283, 292-296; 304 NW2d 553 (1981). "Circuit court judges in the exercise of their equitable powers, may appoint receivers in all cases pending where appointment is allowed by law." MCL 600.2926. This statute has been interpreted as authorizing a circuit court to appoint a receiver when specifically allowed by statute and also when no specific statute applies but "the facts and circumstances render the appointment of a receiver an appropriate exercise of the circuit court's equitable jurisdiction." *Petitpren, supra*

at 294. The purpose of appointing a receiver is to preserve property and to dispose of it under the order of the court. *Cohen v Cohen*, 125 Mich App 206, 214; 335 NW2d 661 (1983). In general, a receiver should only be appointed in extreme cases. *Petitpren, supra* at 295. But a party's past unimpressive performance may justify the trial court in appointing a receiver. *Francis Martin, Inc v Lomas*, 62 Mich App 706, 710-711; 233 NW2d 702 (1975).

Here, because the trial court erred by finding that the Oakland County property was part of the marital estate and because the court made no finding that it was appropriate under a statutory exception to award plaintiff a portion of this property, *Korth, supra* at 291-292; *Reeves, supra* at 494-495, it was unnecessary to appoint a receiver. Accordingly, the trial court abused its discretion.

When a court is without jurisdiction to appoint a receiver, the property inappropriately obtained by the receiver should be restored, as nearly as possible, to the party from whom it was obtained. *People ex rel Port Huron & Gratiot R Co v Jones*, 33 Mich 303, 304 (1876). In this case, because the trial court possessed jurisdiction to appoint a receiver, its order is voidable, not void. *Luscombe v Shedd's Food Products Corp*, 212 Mich App 537, 542; 539 NW2d 210 (1995); *Abbott v Howard*, 182 Mich App 243, 248; 451 NW2d 597 (1990). Further, because the receiver has taken steps to sell portions of the disputed property, it will be necessary for the trial court on remand to fashion appropriate orders to terminate the receivership as may be equitable. *Id.* at 248-249; MCR 2.622(A)(8), (9). See, also, MCL 600.2926, which provides, "The court may terminate any receivership and return the property held by the receiver to the debtor whenever it appears to be to the

best interest of the debtor, the creditors and others interested." Moreover, on remand, the trial court may make further findings of fact and enter such orders as are supported by those findings, including continuing the receivership. *Reed v Newberry*, 292 Mich 476, 483-484; 290 NW 874 (1940).

### VIII. CHILD SUPPORT

Defendant offers no meaningful argument on this issue, which we consider abandoned. *Eldred v Ziny*, 246 Mich App 142, 154; 631 NW2d 748 (2001).

Moreover, the record establishes that defendant possessed substantial earning capacity and retained substantial assets. A trial court is not limited to considering only a parent's actual income when assessing that parent's ability to pay support. *Good v Armstrong*, 218 Mich App 1, 5; 554 NW2d 14 (1996). Rather, the trial court may consider the parent's voluntarily unexercised earning ability, *Ghidotti v Barber*, 459 Mich 189, 198; 586 NW2d 883 (1998), and the parent's assets, including those obtained as part of the property division of the divorce, *Nellis v Nellis*, 211 Mich App 226, 230; 535 NW2d 240 (1995), or retained pursuant to a prenuptial agreement, *Shinkle v Shinkle (On Rehearing)*, 255 Mich App 221, 227; 663 NW2d 481 (2003). Accordingly, defendant utterly fails to meet his burden of showing that the trial court abused its discretion. *Morrison v Richerson*, 198 Mich App 202, 211; 497 NW2d 506 (1993).

### IX. ATTORNEY FEES

#### A. PRESERVATION AND STANDARD OF REVIEW

Because this issue was addressed and decided by the trial court, no further action was necessary to preserve it for appellate review. MCR 2.517(A)(7).

We review a trial court's grant or denial of attorney fees for an abuse of discretion. *Gates, supra* at 437-438. Any findings of fact on which the trial court bases an award of attorney fees are reviewed for clear error, *Solution Source, Inc v LPR Assoc Ltd Partnership,* 252 Mich App 368, 381; 652 NW2d 474 (2002), but questions of law are reviewed de novo, *HA Smith Lumber & Hardware Co v Decina,* 258 Mich App 419, 429; 670 NW2d 729 (2003).

### B. ANALYSIS

We conclude that the trial court abused its discretion by awarding attorney fees without finding that defendant's conduct was unreasonable and that a causal connection existed between fees actually incurred and that conduct, and without finding that the fees so incurred were reasonable.

Under the "American rule," attorney fees are not recoverable as an element of costs or damages unless expressly allowed by statute, court rule, common-law exception, or contract. *Dessart v Burak,* 470 Mich 37, 42; 678 NW2d 615 (2004); *Grace v Grace,* 253 Mich App 357, 370-371; 655 NW2d 595 (2002). In domestic relations cases, attorney fees are authorized by both statute, MCL 552.13, and court rule, MCR 3.206(C).

Nevertheless, attorney fees are not recoverable as of right in divorce actions. *Stackhouse v Stackhouse,* 193 Mich App 437, 445; 484 NW2d 723 (1992). Either by statute or court rule, attorney fees in a divorce action may be awarded only when a party needs financial assistance to prosecute or defend the suit. *Gates, supra* at 438; *Stackhouse, supra* at 445. Here, the trial court did not justify its award of attorney fees on the basis of plaintiff's financial need. Instead, the court relied on the common-law exception to the American rule "that

an award of legal fees is authorized where the party
requesting payment of the fees has been forced to incur
them as a result of the other party's unreasonable
conduct in the course of the litigation." *Id.*

Under the exception to the American rule the trial
court used, the attorney fees awarded must have been
incurred because of misconduct. *Grace, supra* at 371
(the focus is on whether the wrongful conduct of one
party caused the other party to incur the legal fees);
*Stackhouse, supra* at 445-446. The trial court abused its
discretion by awarding attorney fees on the basis of
defendant's unreasonable conduct without finding that
defendant's misconduct caused plaintiff to incur the
fees awarded. Without a specific finding of misconduct,
or finding a violation of a court order, the trial court
broadly asserted that defendant "caused this litigation
to continue for two and one-half years." This statement
is too general to permit meaningful review. Further, the
fact that litigation has been lengthy is not by itself
reason to conclude misconduct has occurred. Although
defendant's failure to comply with a discovery order
constituted misconduct, plaintiff did not establish what
fees she incurred as a result. Finally, presenting at trial
evidence made relevant by the court's rulings, which
the other party determines should be countered with
rebuttal evidence, is not misconduct. See, e.g., *People v
Noble*, 238 Mich App 647, 660; 608 NW2d 123 (1999),
stating that "misconduct cannot be predicated on good-
faith efforts to admit evidence."

Moreover, the trial court further erred by not con-
ducting a hearing or finding facts regarding the reason-
ableness of the fees incurred. *Miller v Meijer, Inc*, 219
Mich App 476, 479-480; 556 NW2d 890 (1996); *Petter-
man v Haverhill Farms, Inc*, 125 Mich App 30, 33; 335
NW2d 710 (1983). The party requesting attorney fees

bears the burden of proving they were incurred, *id.*; MCR 3.206(C)(2), and that they are reasonable, *Solution Source, supra* at 382, citing *Bolt v City of Lansing (On Remand),* 238 Mich App 37, 61; 604 NW2d 745 (1999). When requested attorney fees are contested, it is incumbent on the trial court to conduct a hearing to determine what services were actually rendered, and the reasonableness of those services. *Miller, supra* 219 Mich App at 479-480; *Petterman, supra* at 33. The trial court may not award attorney fees, as apparently occurred here, solely on the basis of what it perceives to be fair or on equitable principles. *In re Adams Estate, supra* at 237.

In the instant case, the only evidence pertaining to attorney fees was plaintiff's testimony that before trial she had received a statement for $100,000 from her current attorney and that she had paid a prior law firm a $6,000 retainer. In addition, plaintiff's counsel asserted in opening statement that plaintiff's attorney fees were then in excess of $140,000, and counsel stated in closing argument that plaintiff's legal fees had increased by $80,000 for twelve days of trial. But plaintiff submitted no evidence regarding what fees were actually incurred because of defendant's misconduct, and the trial court made no finding in that regard or concerning the reasonableness of the fees incurred because of misconduct. Accordingly, the trial court abused its discretion.

## X. CONCLUSION AND SUMMARY

The parties' prenuptial agreement is valid, and the trial court erred by finding that changed circumstances justified not enforcing it. This error affected many of the trial court's other rulings, including the court's determination of the marital estate, the equitable divi-

sion of marital property, appointment of a receiver, and possibly the trial court's decisions regarding child and spousal support. Although it is premature to address whether the trial court equitably divided the marital estate, the record is sufficient to address the heart of defendant's arguments that certain assets were wrongly included as part of the marital estate. The marital residence, the Harbor Springs condominium, and the proceeds from the city of Detroit's condemnation of the property at 225 Garfield were properly included as marital assets. The real property in Oakland County and the Malcolm X papers should be excluded from the marital estate. Further, we hold that the trial court had jurisdiction to determine defendant's interest in the disputed property, and that defendant's claim that other individuals and entities with claims to the disputed property were denied due process is without merit.

Because the trial court erred by including the Oakland County property in the marital estate and made no finding that it was appropriate under a statutory exception to award plaintiff a portion of this property, it was unnecessary to appoint a receiver. On remand, the trial court must enter such orders to terminate the receivership as may be equitable. But remand is without prejudice to the continuation of the receivership if the trial court makes further findings of fact to justify such a decision and it is equitable to do so.

Finally, the trial court abused its discretion by awarding plaintiff attorney fees without first finding a causal connection between fees actually incurred and any unreasonable conduct of defendant, and without finding that attorney fees so incurred were reasonable.

Accordingly, we affirm in part, reverse in part, and remand this case to the trial court for further proceed-

ings consistent with this opinion. Neither party having completely prevailed, no costs are awarded. MCR 7.219(A). We do not retain jurisdiction.

OWENS, J., concurred.

FITZGERALD, J. (*dissenting*). I respectfully disagree with the majority's conclusion that the trial court erred by declaring the parties' May 1975 prenuptial agreement null and void and that the error affected many of the trial court's other rulings. Thus, I would affirm the pretrial order granting partial summary disposition to plaintiff. I would also affirm the judgment of divorce because the trial court's findings of fact regarding the marital estate are not clearly erroneous and because the distribution of the marital property was fair and equitable.

The May 15, 1975, prenuptial agreement was entered into at a time when prenuptial agreements in contemplation of divorce were considered to be against public policy. See *Scherba v Scherba,* 340 Mich 228, 231; 65 NW2d 758 (1954).[1] The prenuptial agreement at issue in this case stated in its entirety:

> 1. Release of dower. Gregory J. Reed shall hold all real and personal property which he now owns or may hereinafter acquire free from any claims of dower, inchoate or otherwise, on the part of Verladia Thomas and this agreement shall evidence the right of Gregory J. Reed to convey any of his real estate owned or acquired hereinafter free from any claims of dower. At the request of Gregory J. Reed, Verladia Thomas shall execute, acknowledge and deliver such other instruments as may be reasonably required to accomplish the transfer by Gregory J. Reed of

---

[1] Prenuptial agreements that contemplated divorce were not recognized in Michigan until 1991. *Rinvelt v Rinvelt,* 190 Mich App 372, 382; 475 NW2d 478 (1991).

any real property free from any such claims of dower and to divest any claim of dower in such property.

2. In the event of divorce between Gregory J. Reed and Verladia Thomas, Gregory J. Reed shall be awarded the residence at 2460 Burns, Ave., Detroit, Michigan.

3. Separate Property. Except as herein provided, each party shall have complete control of his or her separate property, and may enjoy and dispose of such property in the same manner as if the marriage had not taken place. The foregoing shall apply to all property now owned by either of the parties and to all property which may hereafter be acquired by either of them in an individual capacity.

4. Consideration. The consideration for this agreement is the mutual promises herein contained and marriage which is expected to take place between the parties.

5. Effective date. This agreement is effective from the date hereof and inures to the benefit of the parties, heirs, executors and administrators.

At the time of the agreement, plaintiff had been working for three years as an engineer, and defendant was a recent law school graduate. Their net worth at the time of the 1975 marriage was less than $20,000.

Over the course of the twenty-five year marriage, the parties raised two children and accumulated assets in excess of $5 million. Plaintiff filed this divorce action in October 2000. Defendant, relying on the 1975 prenuptial agreement, contended that he was entitled to everything he purchased over the course of the parties' marriage. The trial court determined the marital estate to consist of the following property:

(1) A condominium in Harbor Springs, Michigan, valued at $110,595.

(2) Defendant's one-half interest in an office building located at 1201 Bagley, Detroit, valued at $175,000.

(3) Stocks and other investments valued at $21,856.

(4) The net proceeds of the condemnation of the property at 225 Garfield, Detroit, valued at $887,117.

(5) Detroit Edison pension annuities and worker's compensation valued at $172,845.

(6) A SEP and IRAs in the amount of $215,874.

(7) Savings and miscellaneous in the amount of $7,900.

(8) 383.92 acres of land located in Springfield Township, Oakland County, with an estimated value between $2.9 million and $3 million if sold undeveloped and, if sold developed, between $8 million and $10 million.

(9) The marital residence at 2460 Burns, Detroit, valued at $543,449 according to its 2002 state equalized valuation or $450,000 as appraised.

(10) Defendant's law practice with a value estimated at $55,059 because defendant did not provide expert evaluator John Stockdale necessary financial information.

(11) Plaintiff's business, VTR Consulting Inc., valued at $950 by Mr. Stockdale.

(12) Malcolm X papers, valued by the parties at $125,000.

(13) Plaintiff's incurred debt in the amount of $180,000.

Defendant maintained that these assets, with the exception of items 5 and 11, were acquired by him as his separate property.

Plaintiff moved for partial summary disposition, contending that the prenuptial agreement was unenforceable, in part because of the change in the parties' circumstances between the time the agreement was signed and the time of the divorce. She maintained that

it would be unfair and unconscionable to enforce the agreement as interpreted by defendant.

Following a hearing, the trial court granted plaintiff's motion, stating in part:

However, I think the real reason why I have to strike down this agreement is the criteria, the third criteria [sic] mentioned and that is that in determining the fairness of [the] antenuptial agreement, the issue is whether the facts and circumstances have changed since the agreement was executed making its enforcement unfair and unreasonable and that's from *Brooks v Brooks* [733 P2d 1044 (Alas, 1987)].

Under *Brooks* analysis, the issue is not the fairness of the agreement when it was signed but on whether the facts and circumstances have changed since the agreement was executed. And I think there's an unpublished case that discussed this very well and that's *Kuziemko* [*v Kuziemko*, unpublished opinion per curiam of the Court of Appeals, issued December 4, 2001 (Docket No. 212377)]. . . . [T]he Court refers to cases from other jurisdiction[s] and it states the case[s] that discuss prenuptial agreements in other jurisdictions lead to the conclusion that when Courts talk about fairness in the setting of a prenuptial agreement, they're usually not talking about an entirely subjective open-ended concept that allows Judges to renegotiate contracts and substitute their own judgment for the agreement of the parties. Rather, what other Courts are really concerned about is foreseeability.

Continuing, for the change of circumstances to be uncontemplated, the event must not have been reasonably foreseen by the parties prior to or at the time of making the agreements. The Court went on to state our Court should enforce specific terms of the agreement if the circumstances at the time that the marriage ends were what the parties foresaw at the time they entered the prenuptial agreement. And in this case, given the duration of the marriage, 26 years, the age and financial status of the parties at the time they signed the agreement, and the significant changes in the financial status of both parties

since that time, I believe it would be both unfair and unconscionable to enforce an agreement executed 26 years earlier under far different facts and circumstances and certainly with a marital estate that could not have possibly been foreseen to have grown to the proportion that it has by these parties.

Defendant argues that the trial court improperly invalidated the prenuptial agreement on the ground that circumstances have changed so that it is unfair and unreasonable to enforce the agreement at the time of divorce. *Booth v Booth*, 194 Mich App 284, 288-289; 486 NW2d 116 (1992). I disagree.

Evidence was presented that the parties earned similar incomes during the duration of the marriage. Both parties worked full-time, but plaintiff was the primary caregiver for the parties' two children and had primary responsibility for running the household. In the evenings, plaintiff would work at home for defendant's law practice. The parties acquired various business interests that grew significantly over the years. Among the most valuable assets are the proceeds from a condemnation lawsuit involving the building that was purchased when defendant moved his law practice out of the marital home. The parties renovated the building to house the law practice as well as other entities defendant formed. Plaintiff assisted in the renovation by painting, installing flooring, stripping and staining paneling, upholstering furniture, making curtains, and laying bricks in the walk and driveway. The building was later the subject of an eminent domain action by the city of Detroit. Ultimately, the action was settled and the city agreed to pay the combined sum of $1.25 million to the named defendants in that suit and the lienholders, including both plaintiff and defendant. The net proceeds to the parties were $887,117.

This Court must consider the prenuptial agreement at the time it is to be enforced to determine whether the agreement is unfair and unreasonable as a result of unforeseeable changed circumstances. This case does not involve the typical situation in which one party brings significantly greater assets into the marriage. It would be unfair and inequitable to allow a party to leave a lengthy marriage with assets in excess of $5 million, all of which were acquired during the marriage as a result of the family's labor, and to leave the other spouse, who not only contributed equally to the family income but also had responsibility for the children, with significantly less. The circumstances of the parties at the time of dissolution are so far beyond those contemplated by the parties when the agreement was made that enforcement of the agreement would work an injustice.